## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

JAY CLASING and DEANNA
CLASING, d/b/a JADE FARMS,

      Plaintiffs,

vs.

HORMEL CORP.,

      Defendant.

No. C 12-3054-MWB

MEMORANDUM OPINION AND
ORDER REGARDING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

---

## TABLE OF CONTENTS

I.    **INTRODUCTION**.................................................................3
    A.    *Factual Background* ................................................3
        1.    *The parties*..................................................3
        2.    *The parties' written agreements* ..........................3
        3.    *The impact of COOL* ......................................5
            a.    *The requirements of COOL* ....................5
            b.    *Replacement of the Written Agreement with an Oral Agreement* ..............................6
            c.    *The Clasings' purchase of additional Canadian pigs* ....................................8
        4.    *The amendment or breach of the parties' Oral Agreement* .....................................8
    B.    *Procedural Background* ..........................................12
        1.    *The Complaint and the Answer*...........................12
        2.    *Hormel's Motion For Summary Judgment*................15

II.    **LEGAL ANALYSIS** .................................................16
    A.    *Standards For Summary Judgment* ............................16
    B.    *Hormel's Motion For Summary Judgment* ..................17
        1.    *The breach-of-contract claim* ...........................18
            a.    *Arguments of the parties* ......................18
            b.    *Analysis* .......................................22

　　　　　　i.　　The "notice" term ........................................ 23
　　　　　　ii.　　Assent to the new "pricing" term..................... 26
　　　　　　iii.　　Breach of the "pricing" term........................... 27
　　　　　　iv.　　Breach of the "delivery" term.......................... 28
　　　　c.　　Summary......................................................... 30
　　2.　　The claim of breach of the implied covenant of good
　　　　faith and fair dealing.................................................. 30
　　　　a.　　Arguments of the parties ...................................... 30
　　　　b.　　Analysis ......................................................... 32
　　3.　　The implied contract claims ........................................... 38
　　　　a.　　Arguments of the parties ...................................... 38
　　　　b.　　Analysis ......................................................... 39
III.　　CONCLUSION .............................................................. 40

This is a diversity action by hog finishers against a meat packing company for alleged breach of a 2008 oral contract between the parties for continued purchases of the hog finishers' Canadian-born hogs after legislation implementing mandatory "country of origin labeling" (COOL) for pork became effective. The hog finishers allege that, in 2009, the meat packing company unilaterally changed the pricing and terms for delivery of the hog finishers' Canadian-born hogs. The parties stipulated to the dismissal of the hog finishers' claim of tortious interference with prospective business advantage, but the meat packing company has now moved for summary judgment on the hog finishers' remaining claims of breach of oral contract, breach of implied covenant of good faith and fair dealing, breach of implied-in-fact contract (promissory estoppel), and breach of implied-in-law contract (quasi-contract).

# I.     INTRODUCTION

## A.     *Factual Background*

I set forth here only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning the meat packing company's motion for summary judgment.  Thus, the "universe" of facts stated here is considerably smaller than the complete set of facts, undisputed and disputed, set forth in the parties' various statements of fact.  Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment.  If necessary, I will discuss additional factual allegations, and the extent to which they are or are not disputed or material, in my legal analysis.

### 1.     *The parties*

During the time period relevant to their lawsuit, plaintiffs Jay Clasing and Deanna Clasing, husband and wife, doing business as Jade Farms, were engaged in the business of purchasing weaner pigs from sow farms, growing and finishing such weaner pigs to slaughter weight, and then selling the market hogs for slaughter.  Unless otherwise appropriate, I will refer to the Clasings and/or Jade Farms, individually or collectively, simply as the Clasings.  The Clasings were residents of and conducted their hog finishing business in Palo Alto County, Iowa.  Defendant Hormel Corporation, a Delaware corporation with its principal place of business in Austin, Minnesota, registered to do business in Minnesota and Iowa, is a "packer" as defined in 7 U.S.C. § 191, for purposes of the Packers & Stockyards Act of 1921, 7 U.S.C. §§ 181 *et seq*.  As part of its business, Hormel purchases hogs for slaughter.

### 2.     *The parties' written agreements*

On April 20, 2007, Hormel entered into a Hog Procurement Agreement (the Written Agreement) with the Clasings with an effective date of July 1, 2007.  *See*

Defendant's Appendix, Tab I. The initial term of the Written Agreement was one year, with an expiration date on June 30, 2008. The Written Agreement had an "evergreen clause," however, pursuant to which it would automatically renew at the end of the initial term for successive six-month terms, unless terminated by either party by written notice at least ninety days prior to the end of the then-current term. The Written Agreement included a term that gave Hormel the right to terminate the Written Agreement by written notice to the Clasings at any time if anticipated "country of original labeling" or COOL legislation was passed into law in the United States and certain other contingencies, not at issue here, were met.

The Written Agreement provided a base price for the Clasings' market hogs "equal to the Western Cornbelt Price," which was further defined as "the average price per carcass cwt. of the prior day's daily weighted average base price for negotiated purchases of barrows and gilts reported by *USDA Market News in Western Cornbelt Daily Direct Hog—Afternoon*, report HG212 ('**Western Cornbelt Report**') plus $2.00 per carcass cwt." *Id*. at 73 (Tab I at 8) (emphasis in the original). This precise contractual definition of "Western Cornbelt Price" notwithstanding, the parties sometimes refer to the price under the Written Agreement as "Western Cornbelt Price plus $2.00" or "WCB + 2.00." *See, e.g.,* Defendant's Statement Of Material Facts, ¶ 38. In addition, Hormel provided certain premiums and/or discounts based upon the weight and back fat of the carcasses shown on a Lean Pork Value Table provided to the Clasings. Hormel also provided additional incentives if a certain percentage of carcasses fell within a designated range of weights and back fat in a given quarter. The Written Agreement between the Clasings and Hormel was amended on June 27, 2008, to change the delivery schedule for the Clasings' hogs, but not the pricing.

On or about May 8, 2007, that is, shortly after the Clasings entered into the Written Agreement with Hormel, the Clasings entered into a Purchase Agreement with

Big Sky Farms, Inc., a pig supplier in Saskatchewan, Canada, to purchase weaner pigs at a base price of $35.80 a head, but a copy of that agreement is not available. The parties dispute whether the Big Sky Purchase Agreement allowed the Clasings to terminate that Purchase Agreement upon the implementation of COOL legislation, as Hormel contends, or when the Clasings were unable to have their Canadian-born hogs slaughtered, as the Clasings contend.

No claims in the present litigation are based on any alleged breach of the Written Agreement between the Clasings and Hormel, and it is clear that the Clasings delivered Canadian-born hogs to Hormel during the period that the Written Agreement was in force. The Clasings allege that, prior to September 2008, Hormel provided flexibility and had worked cooperatively with the Clasings and other producers to schedule the delivery of market hogs at times that would satisfy Hormel's requirements while also allowing producers to maintain the weight and flow of pigs in their production systems. Hormel qualifies this allegation by alleging that, although it maintained the right to set a delivery schedule pursuant to the Written Agreement, Hormel provided producers with flexibility, to the extent possible, through oral agreements and prior course of dealing.

### 3. *The impact of COOL*

#### a. *The requirements of COOL*

There is or can be no dispute that the situation for the parties changed dramatically on May 22, 2008, when Congress passed the 2008 Farm Bill, which, among other things, amended the 2002 Farm Bill's mandatory COOL provisions for various meats, including pork. *See* 7 U.S.C. § 1638a(a)(1) and (2)(A)-(D). There is no dispute that the hogs sold by the Clasings to Hormel under the Written Agreement were then designated "Category B" hogs, based upon the 2008 COOL provisions in § 1638a(a)(2)(B), because they were Canadian-born, although they were finished in the United States. Also, there is or can be no dispute that those hogs could not be

5

designated "Category A" hogs, based on § 1638a(a)(2)(A), which indicates United States country of origin, because they had not been exclusively born, raised, and slaughtered in the United States. Therefore, in order to comply with COOL, Hormel was required to keep "Category B" hogs, such as those produced by the Clasings, as well as other categories of hogs, segregated from "Category A" hogs.

### b. Replacement of the Written Agreement with an Oral Agreement

On September 11, 2008, Hormel sent a memorandum to all hog producers that sold hogs to Hormel, including the Clasings, explaining the requirements of COOL and Hormel's new policies based upon COOL. The September 11, 2008, memorandum indicated that Hormel would continue to accept Category B hogs at limited times and limited days of the week, but only to certain facilities. During the fall of 2008, Hormel representatives discussed with the Clasings the risk (according to Hormel) or the possibility (according to the Clasings) that Hormel would discontinue taking Category B hogs, and the parties agree that Hormel gave the Clasings contacts for United States sources of weaner pigs.

Hormel alleges, and the Clasings admit, that Hormel sent the Clasings a letter dated September 29, 2008, providing the Clasings with ninety days' notice of termination of their Written Agreement, effective December 31, 2008. The parties also agree that the Written Agreement terminated on December 31, 2008, pursuant to the terms of the September 29, 2008, written notice. There is no claim in this litigation that termination of the Written Agreement was improper. There is a dispute, however, about whether the notice of termination was based on a decision that Hormel had made at that time with respect to the implementation of COOL, as Hormel contends, or whether Hormel only made a decision about implementation of COOL considerably later, as the Clasings contend.

The parties agree that, on the same day that Hormel terminated the parties' Written Agreement, the parties orally agreed that Hormel would continue to accept the Clasings' Category B hogs after termination of the Written Agreement at the same base price provided in the Written Agreement "until further notice." This is the Oral Agreement on which the Clasings' claims in this litigation are based. These terms are indicated in a handwritten internal memorandum of Hormel at Defendant's Appendix, Tab N, dated September 29, 2008.[1] The Clasings contend that the "further notice" required under this Oral Agreement was six months' notice, because that was consistent with the amount of time necessary for the Clasings to market any Category B hogs in their system when the notice was received and the amount of notice that Hormel provided to other producers with Category B hogs. Hormel disputes that there was any requirement for six months' notice—or, indeed, for any particular period of notice at all—under the Oral Agreement or that Hormel provided any other producer with six months' notice, because Hormel asserts that there is no evidence to support either allegation.

The Clasings allege that, after September 2008, Hormel severely limited their flexibility in scheduling the delivery of their market hogs, including by requiring

---

[1] The internal memorandum states the following:

> Jade Farms                                    9-29-08
>
> Verbally agreed to allow Jade to continue to deliver hogs against 777-74 pricing until further notice. We did give him notice on his contract so that it couldn't evergreen for the next year but will allow him to continue to deliver hogs on [?] current pricing. Need an internal final ruling on how COOL will be handled.

Defendant's Appendix 615 (Tab N).

delivery of at least two loads each day and limiting the maximum number of loads that would be received each day. Hormel denies that the Oral Agreement granted the Clasings any right to influence the delivery schedule, but alleges that the Clasings did have input into their scheduling of hog deliveries and purposefully delivered two to three loads each day.

### c. The Clasings' purchase of additional Canadian pigs

On or about November 20, 2008, the Clasings purchased an additional 4,415 head from Big Sky, in excess of the pigs that the Clasings were already receiving under the Big Sky Purchase Agreement, at a price of $22.00 per head, that is, $13.80 below the contract price in the Big Sky Purchase Agreement. There is or can be no dispute that these additional pigs would be designated Category B hogs at slaughter, because they were born in Canada. The Clasings admit that, at the time that they purchased these additional Canadian-born pigs, they did not know what the market hog price would be for those pigs. The Clasings contend that, prior to purchasing these additional Canadian pigs, Jay Clasing contacted and received assurances from Hormel that Hormel would take the additional Canadian-born pigs when they reached slaughter weight. The Clasings contend that they would not have agreed to purchase these additional Canadian-born pigs, if Hormel had not given them such assurances. Hormel contends that the record shows that, at most, Hormel representatives had indicated a willingness to buy the Category B hogs when the time came, but that there was no agreement to purchase them at any specified price.

### 4. The amendment or breach of the parties' Oral Agreement

On January 15, 2009, the USDA published the final rule for compliance with mandatory COOL, which became effective March 16, 2009. Hormel alleges that, through early 2009, it negotiated with the Clasings about taking delivery of additional Category B hogs and about setting a date for the end of the Clasings' delivery of

Category B hogs. Hormel alleges that, eventually, on April 16, 2009, it agreed with the Clasings that it would take the Clasings' excess Category B hogs through December 15, 2009, and would pay the Clasings a base price of the Western Corn Belt plus $1.50 (which the parties agree was $0.50 less per cwt. than the previously agreed price) with a 94 percent USDA cutout cap for all Category B hogs delivered after May 3, 2009. The "USDA cutout cap" capped the base price at 94 percent of the Carcass Cutout Price that the USDA formulates, as indicated in reports published by the USDA. Hormel alleges that the parties also agreed that the Clasings would deliver twelve loads of Category B hogs per week at the new agreed price and that Hormel would make efforts to accept additional loads from the Clasings, but that those additional loads would be priced at Hormel's open market negotiated pricing. Hormel also alleges that, on April 16, 2009, in an e-mail to the Clasings, Hormel confirmed in writing the parties' amendment of the Oral Agreement, to be effective May 3, 2009, *see* Defendant's Appendix, Tab U,[2] and Hormel refers to this e-mail as the "Amendment" of the Oral Agreement.

---

[2] The internal e-mail, dated April 16, 2009, at 11:13 a.m., which shows that it was forwarded to the Clasings on April 16, 2009, at 11:55 a.m., states the following:

> After much discussion and negotiation and Jay obviously getting the better end of the deal, this is what we agreed to:
>
> Starting May 3, 2009 we will take 12 loads per week of Canadian born pigs on a day prior WCB + 1.50 with a 94% of USDA cutout cap. This is a slight increase from 12 loads per week to previously being 10 loads per week. We also agree to try and squeeze into our schedule any additional loads of Canadian sourced pigs that Jay has and these will be priced on our open (negotiated) market. We have agreed to take these Canadian sourced pigs up until December 15, 2009.

(Footnote continued . . .

The Clasings dispute that there was a "negotiation" or an "Amendment"; rather, they contend that Hormel dictated what it was going to do, including unilaterally changing the price for the Clasings' Category B hogs. Similarly, the Clasings admit that they received an internal e-mail forwarded to them by Doug England at Hormel stating the terms dictated by Hormel for the purchase of the Clasings' Category B hogs after May 3, 2009, but the Clasings deny that this e-mail "confirmed" any negotiation of or agreement to the purported Amendment. When asked at deposition if he had accepted Hormel's terms in April 2009, because he didn't have other options for the Canadian-born hogs, Mr. Clasing answered, "I accepted them, but I didn't agree with it." Defendant's Appendix at 59 (Tab H) (Jay Clasing Deposition at 125:15-21).

On April 17, 2009, Doug England e-mailed the Clasings a Hormel Quality Assurance Program and Animal Welfare Handling document, Defendant's Appendix, Tab W, for signature, stating, inter alia, "Jay, I know that you already signed this welfare requirement. I need it signed again for the new contract agreement." Defendant's Appendix, Tab V. The Clasings signed the Producer Certification for the Quality Assurance Program and Animal Welfare Handling Document on April 29, 2009, and e-mailed it back to Doug England that same day. The parties dispute whether Mr. Clasing knew that the Certification was associated with the purported Amendment of the Oral Agreement and the Clasings deny that they negotiated or agreed to the terms of the purported Amendment.

At some point, the Clasings had entered into a Renewal Term Addendum Livestock Purchase Agreement, effective May 1, 2009, renewing the May 8, 2007, Purchase Agreement between the Clasings and Big Sky. Plaintiffs' Appendix, Tab I. The Clasings contend that, immediately upon learning in April 2009 that Hormel would

Defendant's Appendix, Tab U.

stop accepting Canadian-born market hogs in December 2009, they contacted Big Sky to terminate the Clasings' contract with Big Sky for the future purchase of Canadian-born weaner pigs, effective July 18, 2009. Defendant's Supplemental Appendix at 192-94 (Tab II). Hormel denies that Jay Clasing did not learn that Hormel would discontinue accepting Canadian-born market hogs until April 2009, because Hormel representatives had been working with the Clasings since at least January 2009 to help them find a replacement source of pigs and had been informing the Clasings that Hormel was not going to be a long-term harvester of Canadian-born hogs.

The Clasings admit that, on May 3, 2009, they began to deliver, on average, more than 12 loads of Canadian-born hogs per week to Hormel and that they were paid and accepted payment at the reduced price stated in the purported Amendment. The Clasings allege, however, that they repeatedly protested the change in the pricing of their Canadian-born hogs. The parties agree that, at times after May 3, 2009, the 94 percent cutout cap resulted in payment to the Clasings of less than the base price in the purported Amendment of the Western Cornbelt Price plus $1.50. The Clasings also alleged, in their Complaint, that the "unilateral" change in the delivery terms "depriv[ed] [them] of the opportunity to achieve the premiums under Defendant's carcass merit buying program that Plaintiffs had historically achieved." Complaint (docket no. 2), ¶ 33.

The parties agree that the Clasings specifically objected to the terms of the purported Amendment on or about July 1, 2009, but the Clasings contend that they had never agreed to the purported Amendment and that they had protested the price change in the purported Amendment prior to that date, as well. Hormel alleges, and the Clasings deny without citing supporting portions of the record, that the Clasings continued to deliver Category B hogs to Hormel until November 2009.

## B.    Procedural Background

### 1.    The Complaint and the Answer

The Clasings filed the Complaint (docket no. 2) initiating this action against Hormel Corporation on August 6, 2012.  In their Complaint, the Clasings originally asserted five claims, although all are based, at least in part, on Hormel's alleged conduct that also allegedly breached the September 29, 2008, Oral Agreement.

More specifically, in Count I, the Clasings asserted a "breach of contract" claim, based on alleged breach of the Oral Agreement by "unilaterally reducing the price [Hormel] paid for Plaintiffs' market hogs and changing the delivery terms." Complaint, Count I, ¶ 33.  Similarly, in Count II, the Clasings asserted a "breach of implied covenant of good faith and fair dealing" claim, again based on allegations that Hormel "unilaterally alter[ed] the price and delivery terms for the delivery of market hogs from Plaintiffs," but also alleging additional misconduct in breach of the implied covenant, consisting of the following:

> (ii) discriminating against Plaintiffs in the price paid for market hogs by continuing to pay the higher prices to certain preferred producers, and (iii) retaliating against Plaintiffs for reporting a suspected violation of the Packers & Stockyards Act to [the Grain Inspection, Packers & Stockyards Administration of the United States Department of Agriculture (GIPSA)] by refusing to make any future purchases from Plaintiffs and notifying other packers of Plaintiffs' complaint to GIPSA, thereby inducing such other packers to refuse to purchase Plaintiffs' market hogs.

Complaint, Count II, ¶ 39.

In Counts III and IV, the Clasings asserted alternatives to their claim of breach of an express contract in Count I.  Specifically, in Count III, they asserted a claim of "promissory estoppel (contract implied in fact)," based on allegations that Hormel's representations after terminating the parties' Written Agreement "were intended to

induce Plaintiffs to continue to provide market hogs to Defendant," that they acted in reasonable reliance on the promises and representations by Hormel by continuing to purchase Canadian-sourced weaner pigs from Big Sky, but that Hormel's "unilateral changes to the price and delivery terms associated with its purchase of Plaintiffs' market hogs . . . forced [Plaintiffs] to deliver its [sic] market hogs to Defendant at a substantial loss from what Defendant had promised to Plaintiffs," and that an injustice can be avoided only if Hormel's promises to them are enforced. *Id.* at Count III, ¶¶ 43-47. In Count IV, the Clasings asserted a claim of "quasi-contract (contract implied in law)," based on allegations that they conferred a benefit on Hormel by continuing to deliver market hogs to Hormel following the termination of the parties' Written Agreement, that Hormel accepted and appreciated the benefit conferred by the Clasings and understood that the Clasings were relying on Hormel's representations and promises by continuing to purchase Canadian-sourced weaner pigs from Big Sky in order to secure a sufficient supply of weaner pigs, that Hormel "acted unjustly and inequitably by unilaterally reducing the price for Plaintiffs' market hogs . . . and unilaterally imposing new delivery terms," and that "[e]quity and good conscience" require that the court impose contractual obligations and payment terms on Hormel under the doctrine of quasi-contract. *Id.* at Count IV, ¶¶ 50-53.

Finally, in Count V, the Clasings asserted a claim of "tortious interference with prospective advantage," based on allegations identical to part of the third alleged breach of the covenant of good faith and fair dealing in Count II. Thus, in Count V, the Clasings alleged that they had a reasonable expectation and probability of obtaining economic advantage and economic benefits from the future sales of market hogs that they would have finished using their real property and hog finishing facilities and equipment, that Hormel knew of their expectation of economic advantage and economic benefits from the future sales of market hogs, but Hormel "intentionally and wrongfully

interfered with Plaintiffs' expectation of economic advantage and economic benefits from the future sales of market hogs by notifying other packers of Plaintiffs' complaint to GIPSA in retaliation for such complaint, thereby inducing such other packers to refuse to purchase Plaintiffs' market hogs," which resulted in "Plaintiffs hav[ing] been forced to forego the expected economic advantages and economic benefits that Plaintiffs otherwise would have obtained from the future sales of market hogs." *Id.* at Count V, ¶¶ 56-59.

The Clasings seek damages in excess of the diversity jurisdiction jurisdictional amount of $75,000.00, attorneys' fees and costs, and such other and further relief as the court determines is just and equitable under the circumstances.

Hormel filed its Answer And Defenses (docket no. 5) on October 10, 2012, denying all of the Clasings' claims and asserting several affirmative defenses. The affirmative defenses consist of the following, by letter designation used in Hormel's Answer: (A) failure to state claims upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure;[3] (B) bar by the statutory and common law statute of frauds; (C) bar by the doctrine of waiver; (D) bar by the doctrine of accord and satisfaction; (E) bar by the Clasings' failure to provide adequate notice of Hormel's alleged breach; (F) bar to tort theories, because the Clasings' only remedy lies in the law of contract for economic loss; (G) failure to mitigate damages; (H) statutory or common law limitations on damages; and (I) preclusion of recovery by disclaimers, limitations of liability, and/or other language or terms set forth in invoices, receipts, delivery tickets, or other documents provided to the Clasings by Hormel

---

[3] Hormel did not file a Rule 12(b)(6) pre-answer motion to dismiss, however.

Food. Hormel also reserved the right to amend its Answer to assert any additional defense revealed by discovery.

By Order Setting Trial, Final Pretrial Conference, And Requirements For Final Pretrial Order (docket no. 8), filed December 7, 2012, this matter was set for a jury trial to begin on March 10, 2014. Thereafter, discovery appears to have proceeded smoothly, because the next significant procedural matter was the parties' October 17, 2013, Stipulation For Partial Dismissal Of Claims With Respect To Count V Of Plaintiffs' Complaint (docket no. 18), that is, a stipulation to dismiss the Clasings' claim of "tortious interference with prospective advantage." In their Stipulation, the parties stipulated to dismissal of Count V pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, but agreed that such dismissal did not apply to and had no effect on the Clasings' other claims in Counts I through IV.

### 2. *Hormel's Motion For Summary Judgment*

On November 13, 2013, Hormel filed the Motion For Summary Judgment (docket no. 20) now before me. The Clasings filed their Opposition To Hormel's Motion For Summary Judgment (docket no. 36), on December 9, 2013, and Hormel filed its Reply (38) on December 19, 2013.

The parties requested oral arguments on Hormel's Motion For Summary Judgment, but I have found oral arguments on that Motion unnecessary, in light of the record and written arguments provided.[4] Therefore, Hormel's Motion For Summary Judgment is deemed fully submitted on the parties' written submissions.

---

[4] Because the time available in my crowded schedule is limited, I found it more appropriate to set a hearing in my January 13, 2014, Order To Show Cause Why Sanctions Should Not Be Imposed (docket no. 40), on possible sanctionable conduct in the Clasings' Responses To Hormel's Statement Of Material Facts (docket no. 36-1), than to set oral arguments on Hormel's Motion For Summary Judgment.

## II.    LEGAL ANALYSIS

### A.    Standards For Summary Judgment

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) (quoting *Celotex*, 477 U.S. at 323). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burden, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, –––U.S. ––––, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weigh-

ing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43. Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

With these standards in mind, I turn to consideration of Hormel's Motion For Summary Judgment.

### B. Hormel's Motion For Summary Judgment

As I noted at the outset of this opinion, Hormel seeks summary judgment on all of the Clasings' remaining claims. I will consider each claim in turn.[5]

---

[5] Hormel asserted in its Motion For Summary Judgment that the Clasings' claims are controlled by Iowa law, even though the parties' Written Agreement, which was terminated before the conduct giving rise to the Clasings' claims, had a choice of law clause selecting Minnesota law. The Clasings have not disputed the application of Iowa law to their claims.

### 1. The breach-of-contract claim

#### a. Arguments of the parties

Hormel understands the Clasings' breach-of-contract claim to allege that Hormel breached the parties' September 2008 Oral Agreement in two respects: (1) by unilaterally changing the base price for the Clasings' Canadian-born hogs; and (2) by unilaterally changing the delivery terms, thereby making it more difficult for the Clasings to achieve premiums under Hormel's Carcass Buying Program. Hormel contends that neither allegation constitutes a breach of the contract.

First, Hormel argues that, in the Oral Agreement, it never promised to retain the base price or delivery terms under the Written Agreement for any specific period of time and that any evidence of such a promise is barred by U.C.C. § 2-202, where there is a written confirmation of the September 29, 2008, Oral Agreement. Hormel admits that, effective May 3, 2009, it changed the base price to the Western Cornbelt Price plus $1.50 with a 94 percent cutout cap, but Hormel argues that it had the right to change the base price. This was so, Hormel argues, because the parties only agreed to continue with the pricing in the Written Agreement "until further notice." Hormel contends that there is no dispute that the Clasings received "further notice" of the price change by e-mail on April 16, 2009. Similarly, Hormel argues that it had the right to change the delivery schedule. Hormel points out that it had notified the Clasings when COOL was implemented that it would have to segregate Category B hogs, like theirs, from Category A hogs, and that, to do so, it would accept Category B hogs only at certain times or on certain days—specifically, at the beginning of the second shift of the day. Indeed, Hormel contends that the Clasings have been unable to articulate what Hormel did wrong by changing the delivery schedule after April 2009. Hormel points out that changing the delivery schedule was a regular part of the business and its course of dealing with the Clasings, because, for example, it had done so under the parties'

Written Agreement. Hormel also argues that the Clasings have failed to point to any promise by Hormel regarding the delivery schedule.

Second, Hormel argues that the parties mutually agreed to the change in the "pricing" term in the April 2009 Amendment to the Oral Agreement, which was confirmed in an e-mail forwarded to the Clasings, and also agreed to changes in the delivery schedule. Thus, Hormel argues that there was simply nothing "unilateral" about the changes in the "pricing" and "delivery" terms. In fact, Hormel argues that the Clasings initiated the discussion about increasing their loads of Category B hogs to Hormel, because the Clasings needed to find a buyer for about twenty-five loads of hogs that they had purchased at a below-contract price from Big Sky, when no other packer had even offered to pay any price in excess of the flat Western Cornbelt Price for those hogs.[6] Hormel asserts that the price difference after the Amendment amounted to only about $1.00 per hog. Hormel argues that the Clasings did not take any affirmative steps to reject the change in the base price or the delivery schedule, but instead delivered hogs and accepted payment at the new base price. Hormel also asserts that the Clasings manifested consent to the change in the "pricing" term of the Amendment by signing, without objection, the new Quality Assurance and Animal Welfare document, which Doug England had expressly told them needed to be signed again "for the new contract." Hormel contends that it was not until July 2009 that the Clasings decided to object to the new terms, because the 94 percent cutout had begun to

---

[6] Hormel argues that the Clasings continued to cling to Canadian sources for their pigs long after most producers had found United States suppliers and despite Hormel's advice to use and its identification of various United States suppliers of weaner pigs. Hormel then makes the extraneous suggestion that this lawsuit is prompted by the Clasings' inability to realize the windfall profit that they anticipated from purchasing extra Canadian pigs from Big Sky at well below their contract price with Big Sky.

limit the price paid for their hogs, but even after that, the Clasings continued to deliver hogs and to accept payment under the new terms until November 2009.

In response, the Clasings argue that there are at least genuine issues of material fact on their breach-of-contract claim. They argue that there is no dispute that the parties entered into an Oral Agreement on or about September 29, 2008, but that there is a dispute about whether they ever entered into an Amendment in April 2009, or whether, instead, Hormel unilaterally changed the "pricing" and "delivery" terms in April 2009 in breach of the Oral Agreement. Specifically, the Clasings allege that the record shows that Hormel did not provide sufficient notice to terminate the Oral Agreement and substitute new terms. They argue that, while the parties agreed in September 2008 to continue with their existing "pricing" and "delivery" terms "until further notice," there was no agreement that two weeks' notice to change those terms would suffice. Rather, they point out that Jay Clasing testified in deposition that the "until further notice" requirement of the Oral Agreement required Hormel to provide the Clasings with six months' notice of termination or modification. They argue that six months' notice was consistent with the amount of notice that Hormel provided to other producers who were selling Canadian-born, but U.S.-fed market hogs. They also assert that numerous Hormel employees testified that a minimum of one months' notice was required to terminate an oral contract. They contend that their evidence of a specific notice period is not contrary to the UCC, because there is no confirmatory writing concerning the Oral Agreement, only an internal document prepared by Hormel of which they had no knowledge until Mr. Clasing's deposition. They argue that they were not provided with *any* notice that Hormel was terminating the Oral Agreement, only notice that Hormel was unilaterally imposing a reduced price and new delivery terms for their hogs.

The Clasings also argue that there are at least genuine issues of material fact as to whether or not they agreed to the new terms in April 2009 or thereafter. They contend, instead, that Hormel "extorted" the modifications, knowing that the Clasings could not sell their Category B hogs elsewhere. They argue that Hormel does not, and cannot, identify any communication in which the Clasings expressly agreed to amend the Oral Agreement to reduce their contract price, but that Hormel instead relies on their purported silence and continued delivery of hogs after the change. They point out that Mr. Clasing repeatedly asserted in his deposition that he never agreed to the changes and that the Clasings repeatedly complained to Hormel about the changes even before July 2009. They contend that their continued delivery and acceptance of payment was simply compliance with their duty to mitigate damages, while maintaining their objections, because they did not receive an offer to purchase the hogs at a price in excess of what Hormel was paying.

Finally, the Clasings dispute Hormel's contention that it had the right to change the delivery schedule. They contend that the record demonstrates that Hormel had historically worked cooperatively with the Clasings to schedule deliveries during the performance of the Written Agreement, consistent with Hormel's general practice of working with producers. They argue that this past practice among the parties established a course of conduct that replaced the delivery term in the Written Agreement and determined the delivery conditions under the parties' subsequent Oral Agreement. They contend also that, after September 2008, Hormel altered this general practice and course of dealing by imposing specific delivery requirements. They argue that at least one Hormel employee testified that Hormel had ample opportunity to adjust the Clasings' delivery schedule, because there were more slots available for the delivery of Category B hogs than the number of scheduled loads.

In reply, Hormel reiterates that there was no requirement of six months' notice to alter the "pricing" and "delivery" terms of the Oral Agreement. Furthermore, Hormel argues, the Clasings have failed to point to any evidence that, although Hormel understood that the Clasings needed six months to run through their inventory of Canadian-born pigs, Hormel specifically agreed to provide six months' notice of any change in the price or delivery terms or that Hormel gave any other producers six months' notice of such changes. Hormel also reiterates that the Clasings agreed to the change to the "pricing" term in April 2009 by continuing to make deliveries and to accept payment, notwithstanding Mr. Clasing's deposition testimony that he "accepted" but did not "agree" to the change. Hormel contends that the Clasings' assent to the new terms is clearly implied by their conduct. Hormel also reiterates that it had the right to change the delivery schedule, but that it did continue to work cooperatively with the Clasings in accepting deliveries.

### b.    Analysis

As the Iowa Supreme Court has explained,

> To prevail on a breach of contract claim, [the claimant] [i]s required to prove: (1) the existence of a contract, (2) the terms and conditions of the contract, (3) that [the claimant] has performed all the terms and conditions required under the contract, (4) the [opposing party's] breach of the contract in some particular way, and (5) that [the claimant] has suffered damages as a result of [the opposing party's] breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

*Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010); *see Hagen v. Siouxland Obstetrics & Genecology, P.C.*, 934 F. Supp. 2d 1026, 1053 (N.D. Iowa 2013) (citing *Royal Indem. Co.*, 786 N.W.2d at 846, for the elements of a breach-of-contract claim under Iowa law); *Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr., Inc.*, 816 F. Supp. 2d 631, 688 (N.D. Iowa 2011) (citing *Molo Oil*

*Co.*, 578 N.W.2d at 224, for the same elements). Although there is no dispute about the existence of the contract at issue, which the parties agree was the September 2008 Oral Agreement, there is a dispute about the terms and conditions of the contract and whether or not Hormel breached those terms.

### i.    The "notice" term

As to terms of the contract at issue, *see id.* (second element), there is no dispute that the parties agreed to continue the "pricing" term of the Written Agreement in their Oral Agreement "until further notice." The parties' dispute is about whether some specific period of notice was required, as the Clasings contend, or simply notice of new pricing, as Hormel contends. The Clasings rely on extrinsic evidence of the circumstances in which the Oral Agreement was reached—specifically, Hormel's knowledge of how long it would take them to finish their Canadian-born hogs—as demonstrating that six months' notice was required to terminate or alter the terms of the Oral Agreement. Hormel contends that it gave adequate notice on April 16, 2009, that new pricing would become effective May 3, 2009, just over two weeks later.

As the Iowa Supreme Court has explained,

> When considering extrinsic evidence, we have stated:

>> Long ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract. We now recognize the rule in the Restatement (Second) of Contracts that states the meaning of a contract "can almost never be plain except in a context." Accordingly,

>>> "[a]ny determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of

> dealing between the parties. But after the
> transaction has been shown in all its length and
> breadth, the words of an integrated agreement
> remain the most important evidence of
> intention."
>
> In other words, although we allow extrinsic evidence
> to aid in the process of interpretation, the words of
> the agreement are still the most important evidence of
> the party's intentions at the time they entered into the
> contract. When the interpretation of a contract
> depends on the credibility of extrinsic evidence or on
> a choice among reasonable inferences that can be
> drawn from the extrinsic evidence, the question of
> interpretation is determined by the finder of fact.
>
> *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430,
> 436 (Iowa 2008) (citations omitted) (quoting *Fausel v. JRJ
> Enters. Inc.*, 603 N.W.2d 612, 618 (Iowa 1999)).

*Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 107-08 (Iowa 2011).

In the abstract, the phrase "until further notice" does *not* suggest that any particular period of notice is required. Nevertheless, meaning "can almost never be plain except in a context." *Id.* at 107 (internal quotation marks and citations omitted). Thus, I must consider the context in which the parties agreed to the pricing in the Oral Agreement "until further notice." Considering that context, I note, first, that even the parties' prior Written Agreement did not require six months' notice of termination, but only ninety days' notice. *See* Defendant's Appendix at 72 (Tab I), (Written Agreement, § 1). On the other hand, only two weeks' notice is not consistent with the testimony of a Hormel employee that Hormel's policy was that "[a] minimum of 30

days [notice on an oral contract] would have been our policy." Plaintiffs' Appendix, Tab F (Stevens Deposition at 76:5-14).[7]

The Clasings cite in support of their contention that six months' notice was required excerpts from Jay Clasing's deposition, specifically, 86:l-87:20, 88:10-91:19, *see* Plaintiffs' Appendix, Tab A, which the Clasings contend show that Hormel knew that six months was the amount of time necessary for them to market any Category B hogs in their system when the notice was received, and Hormel cites in response additional excerpts at 88:20-89:5, 89:18-90:8, which Hormel contends show that, whatever Hormel might have known about the need for six months to get weaner pigs to market, there was no agreement on the part of Hormel to provide six months' notice of termination or modification of the Oral Agreement's "pricing" terms, only that Hormel had purportedly not made a definitive decision about when and where it would take Category B hogs or when it would cease taking Category B hogs at all. I have reviewed pages 86 through 91 of Mr. Clasing's deposition, which encompasses all of the cited excerpts, and I am not convinced that there was any agreement to six months' notice to terminate or alter the Oral Agreement. That is not the standard for summary judgment, however. *Torgerson*, 643 F.3d at 1042-43. Rather, I must view the facts in the light most favorable to the Clasings and leave to the jury credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts. *Id.* Here, I conclude that this is a case in which "the interpretation of [the notice term of the Oral Contract] depends on the credibility of extrinsic evidence [and] on a choice

---

[7] This deposition testimony was cited by Hormel as demonstrating that six months' notice was not required, but it also suggests that two weeks' notice may have been contrary to the parties' intent, the purpose for which the Clasings also cited this deposition testimony.

among reasonable inferences that can be drawn from the extrinsic evidence," such that "the question of interpretation is [to be] determined by the finder of fact." *Soults Farms, Inc.*, 797 N.W.2d at 107-08 (internal quotation marks and citations omitted).

Therefore, admittedly with some reluctance, I conclude that the Clasings have generated genuine issues of material fact, from the context of the parties' agreement, discussions, and practices, that the Oral Agreement required six months' notice of termination or alteration of its "pricing" term.

### ii. Assent to the new "pricing" term

Hormel contends that, even if there are genuine issues of material fact as to what period of "notice" was required to terminate or alter the "pricing" term of the Oral Agreement, there are no genuine issues of material fact that the Clasings assented to the new "pricing" term by continuing to deliver hogs and to accept payment for them at the "new" price. Consent to the modification of contract terms may be either express or implied from acts or conduct. *See Seneca Waste Solutions, Inc. v. Sheaffer Mfg. Co., L.L.C.*, 791 N.W.2d 407, 413 (Iowa 2010) (citing *Passehl Estate v. Passehl*, 712 N.W.2d 408, 417 (Iowa 2006)). Iowa courts have long recognized that whether a contract has been modified by the parties is ordinarily a question of fact. *See Seneca Waste Solutions, Inc. v. Sheaffer Mfg. Co., L.L.C.*, 820 N.W.2d 159, 2012 WL 2406124, *3 (Iowa Ct. App. 2012) (slip op.) (citing *Davenport Osteopathic Hosp. Ass'n of Davenport, Iowa v. Hosp. Serv., Inc. of Iowa*, 154 N.W.2d 153, 157 (Iowa 1967)); *Tindell v. Apple Lines, Inc.*, 478 N.W.2d 428, 430 (Iowa Ct. App. 1991) (also citing *Davenport Osteopathic Hosp. Ass'n*, 154 N.W.2d at 157).

As the Clasings point out, in *Davenport Osteopathic Hospital Association*, the Iowa Supreme Court concluded that "mere acceptance by [a party] of a lesser amount than that prescribed in the original contract d[oes] not of itself disclose or stand as an assent to the modification," at least where there is no express consent and the

complaining party "openly and repeatedly voiced objection to the change." 154
N.W.2d at 158. Rather, a party may "stand by the contract and seek recovery for any
claimed breach." *Id.* Although I might reach a contrary conclusion, if I were the trier
of fact, viewing the evidence in the light most favorable to the Clasings and leaving to
the trier of fact the determination of credibility and the inferences to be drawn from the
evidence, *see Torgerson*, 643 F.3d at 1042-43, I conclude that the Clasings have
pointed to sufficient evidence to generate genuine issues of material fact that they did
not impliedly consent to the change in the "pricing" term, because they have pointed to
evidence that they repeatedly protested the price change, even before July 2009, when
Hormel admits that they expressly objected, notwithstanding that they continued to
deliver hogs and to accept payment. *See Davenport Osteopathic Hosp. Ass'n*, 154
N.W.2d at 158. Hormel's dismissal of Mr. Clasing's deposition testimony that he
made such repeated protests as "self-serving" merely begs the question of the
credibility of Mr. Clasing's testimony about such protests, which is a question for the
jury. *See Torgerson*, 643 F.3d at 1042-43.

Thus, again somewhat reluctantly, I conclude that the Clasings have generated
genuine issues of material fact that they did not consent to the modification of the
"pricing" term of the Oral Agreement.

### iii.    *Breach of the "pricing" term*

The other element of a breach-of-contract claim at issue, with regard to the
"pricing" term of the Oral Agreement, is whether Hormel breached the "pricing" term
of the Oral Agreement when it changed the price for the Clasings' Category B hogs in
April 2009 without adequate notice or consent.[8] *See Royal Indem. Co.*, 786 N.W.2d at

---

[8] To be clear, the Clasings do not appear to allege, and the record would not
generate genuine issues of material fact, that Hormel could *not* "unilaterally" change
(Footnote continued . . .

846 (explaining that the fourth element of a breach-of-contract claim is breach of the terms of the agreement). "A breach of a contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract." *Magnusson Agency v. Public Entity Nat. Co.—Midwest*, 560 N.W.2d 20, 27 (Iowa 1997). Here, because the Clasings have generated genuine issues of material fact that they were entitled to six months' notice of the termination or modification of the "pricing" term in the Oral Agreement and that they did not consent to, but repeatedly protested, that price change when they did not receive such notice, they have also generated genuine issues of material fact as to whether Hormel breached the "pricing" term of the Oral Agreement by altering the pricing for the Clasings' Category B hogs on April 16, 2009, without adequate notice or consent. Thus, Hormel is not entitled to summary judgment on the Clasings' breach-of-contract claim, to the extent that it is based on alleged breach of the "pricing" term of the parties' Oral Agreement.

### iv.    Breach of the "delivery" term

The analysis of the part of the Clasings' breach-of-contract claim based on Hormel's alleged breach of the "delivery" term of the Oral Agreement is somewhat different. This is so, because neither the internal Hormel memorandum at Defendant's Appendix, Tab N, nor Mr. Clasing's deposition testimony indicates that the Oral

---

the "pricing" term, if Hormel gave adequate notice. The Oral Agreement did not compel the Clasings to deliver any hogs to Hormel, but only set the price that Hormel would pay for hogs if the Clasings delivered them. Also, even if Hormel unilaterally changed the price without giving adequate notice, there would be no breach of the "pricing" term of the Oral Agreement, if the Clasings consented to the change. Thus, the alleged breach of the Oral Agreement as to the "pricing" term is properly stated as "changing the price without adequate notice or consent." The Clasings can only win if they prove that the Oral Agreement required six months' notice of a price change, that they did not receive such notice, and that they did not consent to a change in the "pricing" term made without such notice.

Agreement addressed the specifics of the "delivery" terms for the Clasings' hogs at all, beyond an agreement that Hormel would accept delivery of them. Indeed, the Clasings admit that "only the price terms of the [Written Agreement]—not the delivery terms— were incorporated into the parties' [O]ral [A]greement entered on or around September 29, 2008." Opposition Brief (docket no. 36) at 15. Consequently, the Clasings argue that the "delivery" terms of the Oral Agreement, *see Royal Indem. Co.*, 786 N.W.2d at 846 (stating the second element of a breach-of-contract claim to be proof of the terms and conditions of the contract), were established by a course of conduct showing that Hormel had historically cooperated with the Clasings, and other producers, to schedule deliveries.

The Clasings contend that Hormel then "breached" the "delivery" term, *see id.* (fourth term of a breach-of-contract claim), by imposing limitations on the number of deliveries of the Clasings' Category B hogs that it would accept per day and per week, which made it difficult for producers such as the Clasings to deliver hogs that met Hormel's incentive requirements for weights and back fat, because hogs that could not be delivered one week might grow too big by the following week. They also contend that the record shows that Hormel had more delivery slots available for Category B hogs than it was using, so that Hormel could have accepted more deliveries of their Category B hogs.

Hormel points out that it had notified the Clasings when COOL was implemented that it would have to segregate Category B hogs, like theirs, from Category A hogs, and that, to do so, it would accept Category B hogs only at certain times or on certain days—specifically, at the beginning of the second shift of the day— and that changing the delivery schedule was a regular part of the business and its course of dealing with the Clasings, even when the parties were operating under their Written Agreement. Hormel also argues that the Clasings have failed to point to any promise

by Hormel regarding the delivery schedule at or after the termination of the Written Agreement. Hormel also contends that the Clasings have been unable to articulate what Hormel did wrong by changing the delivery schedule after April 2009.

Again, taking the evidence in the light most favorable to the Clasings and leaving to the trier of fact the determination of credibility and the inferences to be drawn from the evidence, *see Torgerson*, 643 F.3d at 1042-43, I conclude that the contrasting evidence cited by the parties demonstrates that there are genuine issues of material fact as to whether there was a practice of cooperation in the delivery of Category B hogs prior to April 2009 that was unilaterally replaced with fixed and inflexible schedules and daily and weekly limits for delivery of Category B hogs after April 2009. To put it another way, to find that the "delivery" term of the Oral Agreement had not been breached as a matter of law, I would have to weigh the evidence and determine credibility, which I cannot do on a motion for summary judgment. *Id.*

### c. Summary

Hormel is not entitled to summary judgment on the Clasings' breach-of-contract claim in Count I of their Complaint. This is true as to either Hormel's alleged breach of the "pricing" term under the Oral Agreement by changing the price without adequate notice or consent, or Hormel's alleged breach of the "delivery" term, established by the parties' course of conduct, by imposing limits on the time and number of deliveries of the Clasings' Category B hogs that Hormel would accept.

## 2. The claim of breach of the implied covenant of good faith and fair dealing

### a. Arguments of the parties

Next, Hormel argues that it is entitled to summary judgment on the Clasings' claim of breach of the implied covenant of good faith and fair dealing in Count II of their Complaint. Hormel argues that a claim of breach of the implied covenant of good

faith and fair dealing in commercial contracts is not an independent cause of action and that the obligation of good faith and fair dealing in the performance of a contract merely directs the court toward interpreting the contract.

The Clasings argue that Hormel has misconstrued their claim in Count II, which they assert alleges *another* breach of the parties' Oral Agreement by Hormel by violating the duty of good faith in the performance of Hormel's obligations under the Oral Agreement. They explain that they have alleged Hormel's violation of the implied covenant in the following ways: (1) unilaterally reducing the Clasings' contract price; (2) discriminating against the Clasings in the price paid for market hogs by continuing to pay the higher price to certain preferred producers; and (3) retaliating against the Clasings for reporting a suspected violation of the Packers & Stockyards Act to the USDA.[9] Accordingly, the Clasings argue that Hormel is not entitled to summary judgment with respect to Count II of their Complaint.

---

[9] This formulation of the third way in which Hormel allegedly breached the implied covenant of good faith and fair dealing, from the Clasings' Opposition Brief at 17, is a considerably truncated version of the third breach of the implied covenant alleged in Count II of the Clasings' Complaint. It appears that what has been omitted is the part of the alleged breach of the implied covenant that overlapped with the "tortious interference with prospective advantage" claim in Count V, which the parties dismissed by stipulation. More specifically, the full allegation of the third breach of the implied covenant in Count II was the following:

> (iii) retaliating against Plaintiffs for reporting a suspected violation of the Packers & Stockyards Act to [the Grain Inspection, Packers & Stockyards Administration of the United States Department of Agriculture (GIPSA)] by refusing to make any future purchases from Plaintiffs *and notifying other packers of Plaintiffs' complaint to GIPSA, thereby inducing such other packers to refuse to purchase Plaintiffs' market hogs*.

(Footnote continued . . .

In reply, Hormel contends that whether Count II is an "independent" claim or merely a claim of "another" breach of the Oral Agreement, Hormel is entitled to summary judgment on this claim, because it acted in accordance with the terms of the Oral Agreement.

### b.    Analysis

As the Iowa Supreme Court has explained, "An implied duty of good faith and fair dealing is recognized in all contracts." *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205, at 99; *Fogel v. Trs. of Iowa Coll.*, 446 N.W.2d 451, 456 (Iowa 1989)).   As the Iowa Court of Appeals had explained a year earlier,

> "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 13 Richard A. Lord, Williston on Contracts § 38.15, at 437 (4th ed.2000) [hereinafter Williston on Contracts ]. This implied covenant generally operates upon an express condition of a contract, the occurrence of which is largely or exclusively within the control of one of the parties. Williston on Contracts § 38.15, at 435.

---

Complaint, Count II, ¶ 39 (emphasis added).   The dismissed "tortious interference" claim was premised on the following comparable allegation:

> Defendant intentionally and wrongfully interfered with Plaintiffs' expectation of economic advantage and economic benefits from the future sales of market hogs *by notifying other packers of Plaintiffs' complaint to GIPSA in retaliation for such complaint, thereby inducing such other packers to refuse to purchase Plaintiffs' market hogs*.

Complaint, Count V, ¶ 58 (emphasis added).

*American Tower, L.P. v. Local TV Iowa, L.L.C.*, 809 N.W.2d 546, 550 (Iowa Ct. App. 2011). Thus, "'the duty of good faith is meant to give the parties what they would have stipulated for at the time of contracting if they could have foreseen all future problems of performance.'" *Id.*

In *Bagelmann*, the Iowa Supreme Court also explained,

> But the covenant does not "give rise to new substantive terms that do not otherwise exist in the contract." *Mid–America Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir.2005) (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 700 (8th Cir.2003)).

*Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012). In *Bagelmann*, the court concluded that an allegation of violation of the implied covenant of good faith and fair dealing must have "a contract term to which it can be attached." *Bagelmann*, 823 N.W.2d at 34. In that case, the court found that the mortgage contract authorized the *mortgagee* to charge for a flood hazard determination, but that this section of the mortgage made clear that the determination was for the *mortgagee's* protection, so that there was no term of the contract demonstrating that the mortgagee's failure to notify the *mortgagor* of its flood zone status was in bad faith. *Id.*

Perhaps more helpful here to determine when a claim of breach of the implied covenant is viable is the decision of the Eighth Circuit Court of Appeals, which predicted—correctly, the decision in *Bagelmann* shows—that "the Iowa Supreme court would conclude that the covenant does not give rise to new substantive terms that do not otherwise exist in the contract." *Mid-American Real Estate Co.*, 406 F.3d at 974 (internal quotation marks and citations omitted). In *Mid-American Real Estate*, the Eighth Circuit Court of Appeals explained, "Instead of creating new substantive obligations, the covenant prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to

that for which the contract was made." *Id*.[10]  To put it another way, the terms of the contract must create a "justified expectation" that a party will act or refrain from acting in a certain way, *while acting in compliance with the contract*, before the implied covenant can be breached.  *Id*. at 976.  Consequently, a claim of breach of the implied covenant is "doomed" if it lacks support in the text of the contract.  *Id*. at 974-75.  In *Mid-American Real Estate*, the Eighth Circuit Court of Appeals concluded that, where the language of the contract between two realtors did not require them to share all property listings, but only those "entered into the MLX Software," the implied covenant was not breached by one realtor's solicitation of sellers to make office-exclusive listings—that is, ones that the seller did not want shared with other realtors— and there was no "justified expectation" about the percentage of that realtor's listings that would be shared with the other realtor.  *Id*. at 975-76.

There may be circumstances in which breach of the implied covenant is closely related to the breach of an express term of the contract.  The Iowa Court of Appeals addressed such a case, in a slip opinion, less than a year after the Iowa Supreme Court's *Bagelmann* decision, in *Team Two, Inc. v. City of Des Moines, Iowa*, 834 N.W.2d 82, 2013 WL 1749909 (Iowa Ct. App. April 24, 2013) (slip op.).  In that case, an ambulance billing contractor alleged both breach of express terms of a written contract with a city, by failing to pay a percentage of post-termination collections to the billing contractor, and breach of the implied covenant of good faith and fair dealing, by implementing a write-off policy that eliminated post-termination payments to the billing contractor.  *See Team Two,* 2013 WL 1749909 at *1.  The Iowa Court of Appeals

---

[10] Hence, Hormel's argument, in its Reply, that it cannot be liable for breach of the implied covenant of good faith and fair dealing, because it acted in accordance with the terms of the Oral Agreement—even if that allegation were true—would not dispose of the claim of breach of the implied covenant.

concluded that the two theories of recovery were "interconnected," because, in that case, the billing contractor could not prove breach of the implied covenant by implementing the write-off policy unless it first proved breach of the express terms of the contract requiring payment of a percentage of post-termination collections. *Id.* at *4. The court found that the express terms of the contract gave the billing contractor a "justified expectation" that the collection of the delinquent accounts that it had managed would continue after its contract was terminated, that the billing contractor had fully performed its obligations under the contract, but that the city, through inaction, had failed even to attempt to collect on those delinquent accounts as it had through the pendency of the contract with the billing contractor, so that the city had injured the billing contractor's right to "'receive the fruits of the contract.'" *Id.* at *5 (again quoting *American Tower*, 809 N.W.2d at 550).

Here, I find no allegation that Hormel "technically complied" with the "pricing" or "delivery" terms of the Oral Agreement as a shield from liability for acting for a purpose contrary to that for which the Oral Agreement was made. *Mid-American Real Estate Co.*, 406 F.3d at 974. Nor have the Clasings' alleged that any express terms of the Oral Agreement created a "justified expectation" that Hormel would act or refrain from acting in a certain way, while acting in compliance with the Oral Agreement. *Id.* at 976. Rather, the Clasings' argument is that Hormel breached the implied covenant by *breaching* the "pricing" term of the Oral Agreement, and doing so for a discriminatory purpose, and by *breaching* the "delivery" terms of the Oral Agreement for a retaliatory purpose.

The Clasings' claims lack the same kind of "interconnection" between the theories of breach of express terms of a contract and breach of the implied covenant at issue in *Team Two*, 2013 WL 1749909 at *4-*5, however. In *Team Two*, the billing contractor had to prove that the city breached a term of the contract requiring payment

of a percentage of post-termination collections, before the billing contractor could prove that the city's write-off policy violated the implied covenant by defeating the billing contractor's justified expectation of a percentage of post-termination collections. *Id.* Here, the Clasings' first allegation of breach of the implied covenant—breach of the "pricing" term—is *identical* to the first alleged breach of the express terms of the contract. Thus, while the Clasings could not succeed on this part of the claim of breach of the implied covenant unless they first succeed on the first part of their breach-of-contract claim, there is no different conduct at issue between the claims. *Compare id.* (the breach-of-contract claim was based on failure to pay a percentage of post-termination collections, and the breach-of-implied-covenant claim was based on the use of a write-off policy to eliminate post-termination collections). Also, the Clasings have not pointed to any way in which breach of the "pricing" or "delivery" terms of the Oral Agreement would defeat a justified expectation of non-discriminatory or non-retaliatory conduct by Hormel that was consistent with the purpose of the contract. *Compare id.* (concluding that the breach of contract defeated a justified expectation concerning conduct consistent with purpose of the contract).

More specifically, to demonstrate that there is "a contract term to which [the breach of the implied covenant] can be attached," the courts have looked to the purpose of the contract terms in question. *Bagelmann*, 823 N.W.2d at 34 (finding that the purpose of the "flood hazard determination" clause in the mortgage was to protect the mortgagee, so that it did not demonstrate that the mortgagee's failure to notify the mortgagor of its flood hazard status was in bad faith); *Team Two*, 2013 WL 1749909 at *5 (concluding that the purpose of the contract, or the billing contractor's "justified expectation" under the contract, was, in pertinent part, to continue payments of a percentage of collections to the billing contractor after termination of the billing contractor's contract, a purpose or expectation thwarted by the city's write-off policy).

Here, the purpose of the "pricing" term of the Oral Agreement was plainly to continue Hormel's purchase of the Clasings' Category B hogs at the same price as under their Written Agreement "until further notice." Similarly, even assuming that the parties' purpose under the Oral Agreement was to continue the parties' cooperation in "delivery" of hogs after termination of the Written Agreement, as established by the parties' course of conduct, the parties' purpose was to do so within the new reality of the COOL requirements for segregation of Category B hogs, such as the Clasings', from Category A hogs. The purposes of these terms of the Oral Agreement were not to prevent discrimination in pricing among hog sellers or retaliation for reporting of alleged misconduct to the USDA, and these terms do not create expectations of "non-discriminatory" or "non-retaliatory" conduct. The Clasings have cited no case, and I have found none, suggesting that the implied covenant of good faith and fair dealing extends beyond the purposes of the parties' contract, so that it would encompass a requirement for a buyer to give a seller the same "pricing" or "delivery" terms that it gave every other seller or that it would bar a buyer's limitation of deliveries to the terms of the parties' agreement, even if the buyer's reason for doing so was to retaliate against the buyer for reporting alleged misconduct of the seller to a government regulatory agency.

Consequently, the Clasings are attempting to impose new substantive terms of "non-discrimination" and "non-retaliation" through the implied covenant, which the implied covenant does not do. *See Bagelmann*, 823 N.W.2d at 34; *Mid-American Real Estate*, 406 F.3d at 974. The Clasings have not generated genuine issues of material fact that there is "a contract term to which [a violation of the implied covenant of good faith and fair dealing] can be attached." *Id*. If the Clasings did not receive "the fruits of the contract," it would be because Hormel breached the "pricing" and "delivery" terms, not because Hormel breached the implied covenant of good faith and fair

dealing. *See American Tower*, 809 N.W.2d at 550 (explaining that the implied covenant bars a party from destroying or injuring the right of the other party to the fruits of the contract); *and compare Team Two*, 2013 WL 1749909 at *5 (concluding that the city's failure at least to attempt to collect on delinquent accounts injured the billing contractor's right to receive the fruits of the contract).

Hormel is entitled to summary judgment on the Clasings' claim of breach of the implied covenant of good faith and fair dealing in Count II of their Complaint.

### 3.    *The implied contract claims*

As noted above, in Counts III and IV of their Complaint, the Clasings asserted alternatives to their claim of breach of an express contract in Count I. Specifically, in Count III, they asserted a claim of "promissory estoppel (contract implied in fact)," and in Count IV, the Clasings asserted a claim of "quasi-contract (contract implied in law). Hormel seeks summary judgment on both of these claims on the same ground.

### a.    *Arguments of the parties*

Hormel asserts that there is no dispute that the parties made an enforceable Oral Agreement on or around September 29, 2008. Thus, Hormel contends that recovery based on an implied contract theory is barred, because the alleged implied contracts cover the same subject matter as the express Oral Agreement. Hormel recognizes that the Clasings were not precluded from *pleading* both "breach of contract" and "breach of implied contract" claims, but that, where there is no dispute that there was an enforceable, express Oral Agreement, any *recovery* must be based on the express contract. In response, the Clasings assert only that they are entitled to assert an implied contract or quasi-contract as an alternative cause of action to an express contract claim, unless and until the trier of fact determines that the parties entered into a valid and enforceable express contract. In reply, Hormel argues that there is no reason to submit

the question of the existence of an enforceable express contract to the trier of fact, because the parties agree that they had an express contract.

### b. Analysis

The claims in Counts III and IV are both species of implied contract. *See Iowa Waste Sys., Inc. v. Buchanan Cnty.*, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000). Of course, Iowa law permits a party to plead both "implied contract" and "express contract" claims, in the event the alleged express contract is found not to exist or is unenforceable. *See, e.g., Union Pac. R.R. Co. v. Cedar Rapids & Iowa City Ry. Co.*, 477 F. Supp. 2d 980, 997 (N.D. Iowa 2007) (applying Iowa law); *GreatAmerica Leasing Corp. v. Rohr–Tippe Motors, Inc.*, 387 F. Supp. 2d 992, 997 (N.D. Iowa 2005) (applying Iowa law). There is a difference between *pleading* alternative theories and *recovering* on alternative theories, however.

Under Iowa law, "'[a]n express contract and an implied contract cannot coexist with respect to the same subject matter, and the law will not imply a contract where there is an express contract.'" *Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W.2d 556, 561 n.2 (Iowa 2002) (quoting *Giese Constr. Co. v. Randa*, 524 N.W.2d 427, 431 (Iowa Ct. App. 1994)); *accord Rogers v. Webb*, 558 N.W.2d 155, 158 (Iowa 1997) ("As a general rule in Iowa one who pleads an express contract cannot ordinarily recover upon an implied contract or quantum meruit." (citation and internal quotation marks omitted)); *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 791 (Iowa 1985); *Clemens Graf Droste Zu Vischering v. Kading*, 368 N.W.2d 702, 712 (Iowa 1985) ("[Iowa] law will not imply a contract where there is an express contract."); *see also Rambo Assocs., Inc. v. S. Tama Cnty. Cmty. Sch. Dist.*, 487 F.3d 1178, 1189 (8th Cir. 2007) (ruling that, under Iowa law, "an express contract necessarily trumps any implied one when there is a conflict between the two."); *GreatAmerica Leasing Corp.*, 387 F. Supp. 2d at 997 (applying Iowa law and noting "the near universal rule of

contracts that an express contract and an implied contract cannot co-exist"). Stated differently, "[g]enerally the existence of a contract precludes the application of the doctrine of [implied contract]." *Johnson v. Dodgen*, 451 N.W.2d 168, 175 (Iowa 1990).

Here, while Hormel does not dispute that the Clasings were entitled to *plead* "implied contract" claims as alternatives to their "express contract" claim, *see Union Pac. R.R. Co.*, 477 F. Supp. 2d at 997; *GreatAmerica Leasing Corp.*, 387 F. Supp. 2d at 997, Hormel does dispute that the Clasings can *recover* on their alternative "implied contract" claims where there is no dispute about the existence of the express contract and no argument that it is unenforceable. I agree. *See, e.g., Scott*, 653 N.W.2d at 561 n.2. Contrary to the Clasings' contention, there is no requirement that a trier of fact determine that their express contract existed and was enforceable, before it is proper to dismiss or grant summary judgment on their "implied contract" claims; it is sufficient if there is no genuine issue of material fact that the contract existed and is enforceable, because in those circumstances, there is no need to submit the questions of the existence and enforceability of the express contract to the trier of fact. *Torgerson*, 643 F.3d at 1042-43. Doing so would serve no purpose and would only potentially confuse matters for the jury.

Because the Clasings have not generated any genuine issues of material fact that recovery on their "implied contract" claims is barred by the parties' express agreement that they had an enforceable express contract, Hormel is entitled to summary judgment on their "implied contract" claims in Counts III and IV.

## III.  CONCLUSION

Upon the foregoing,

1.     Hormel's November 13, 2013, Motion For Summary Judgment (docket no. 20) is **granted in part and denied in part**, as follows:

    a.     the Motion is **denied** as to the Clasings' "breach of contract" claim in Count I of the Clasings' Complaint;

    b.     the Motion is **granted** as to the Clasings' "breach of implied covenant of good faith and fair dealing" claim in Count II of the Clasings' Complaint; and

    c.     the Motion is **granted** as to the Clasings' "implied contract" claims in Counts III and IV of the Clasings' Complaint.

2.     This matter will proceed to trial, currently scheduled to begin on March 10, 2014, *only* on the Clasings' "breach of contract" claim in Count I of the Clasings' Complaint.

**IT IS SO ORDERED**.

**DATED** this 21st day of January, 2014.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA